# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 20-412


**STATE OF LOUISIANA**

**VERSUS**

**DANIEL WHITE**

**-AKA- DANIEL JACKSON**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CATAHOULA, NO. 14-2374
HONORABLE JOHN C. REEVES, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**D. KENT SAVOIE**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of D. Kent Savoie, Van H. Kyzar, and Jonathan W. Perry, Judges.


**AFFIRMED.**

Edward K. Bauman
Louisiana Appellate Project
Post Office Box 1641
Lake Charles, Louisiana 70602-1641
(337) 491-0570
COUNSEL FOR DEFENDANT/APPELLANT:
	Daniel White A/K/A Daniel Jackson

Daniel White
Louisiana State Penitentiary
Oak 3
Angola, Louisiana 70712
COUNSEL FOR DEFENDANT/APPELLANT:
	Daniel White A/K/A Daniel Jackson

Hon. Bradley R. Burget
District Attorney
Ann S. Siddall
Assistant District Attorney
Austin Lipsey
Assistant District Attorney
Seventh Judicial District
4001 Carter Street, Suite 9
Vidalia, Louisiana 71373
(318) 336-5526
COUNSEL FOR APPELLEE:
	State of Louisiana

**SAVOIE, Judge.**

On September 3, 2014, a Catahoula Parish Grand Jury indicted Defendant Daniel White A/K/A Daniel Jackson for the first degree murder of Gwendolyn McIntosh, in violation of La.R.S. 14:30. On July 2, 2018, the State amended the bill to second degree murder, as defined by La.R.S. 14:30.1. The trial court heard Defendant's motion to suppress on September 22, 2017. The motion was denied. The State filed two other motions on the same date which the court granted on August 2, 2018.[1]

The parties conducted jury selection February 25-26, 2019, and the jury began hearing evidence on February 27. At the end of trial, the jury found Defendant guilty as charged on March 12. Defendant was sentenced to life in prison, without benefit of probation, parole, or suspension of sentence, by the trial court on April 4, 2019.

Defendant now appeals his conviction and sentence. For the following reasons, Defendant's conviction and sentence are affirmed.

### FACTS

A Catahoula Parish jury convicted Defendant of the murder of Gwendolyn McIntosh. The bulk of the details regarding the murder were supplied by the trial testimony of Leah Pontiff, Defendant's alleged accomplice. Pontiff explained that she originally met Defendant in 2014 when she was on a work-release program due to a previous offense. Both were working in a restaurant in Monroe. At some point, they became sex partners, but Defendant had another girlfriend named Hannah. Pontiff attended a birthday party for Defendant's oldest son and met

---

[1]Defendant brought a writ to this court, but the issue it addressed is not pertinent to the current appeal. *See State v. White*, 18-590 (La.App. 3 Cir. 8/2/18) (unpublished opinion), *writ granted*, 18-1297 (La. 8/4/18), 250 So.3d 262.

Gwendolyn McIntosh, the victim in this case and the mother of Defendant's children. In June 2014, Pontiff moved into an apartment in Sterlington, Louisiana, with Defendant, McIntosh, and their two children. On Wednesday, June 11, 2014, they went to a Bastrop nightclub together, then came back and slept at the Sterlington residence. Pontiff slept on a mattress in the living room. On Thursday, Pontiff and McIntosh made "a dope run" to Sicily Island on Defendant's behalf, before returning to Sterlington. Pontiff and McIntosh were both sexually involved with Defendant at the time. On Friday, June 13, when Pontiff woke up, Defendant and McIntosh were arguing. Defendant took McIntosh's phone and left with the children. Pontiff and McIntosh then spent the day together. That evening, McIntosh went to her bartending job in Bastrop, and Pontiff stayed at the Sterlington residence. Defendant dropped off the children, and Pontiff babysat them. Pontiff testified she was high on methamphetamine at the time.

On Saturday, June 14, Pontiff and McIntosh went to a Monroe hotel to meet a man named Wayne, so that McIntosh could have sex with him in return for money. Earlier in the day, Wayne washed McIntosh's car. Pontiff went back to Sterlington and stayed there alone using methamphetamine. She checked on McIntosh at the hotel at about 11 PM, but she found her asleep. Pontiff went back to check on her at 5 AM, and the pair returned to the Sterlington residence together. Once there, they both used methamphetamine. Later that same day, Defendant called and invited them to a Father's Day barbeque at his mother's house in Sicily Island.

Both women went to the barbeque, leaving Sterlington at about 7:30 PM and arriving at about 9:30 PM. According to Pontiff, Defendant called her phone while she was driving, and the victim answered. Defendant changed the plan from

meeting at his mother's house to meeting on the highway. Upon meeting, the women followed him to the end of a local road. They took some drugs and then the three of them left in Defendant's Cadillac to buy gasoline and tequila. As he was pumping the gasoline, Defendant handed a length of cord to Pontiff, instructing her to choke the victim the next time they stopped. Pontiff put the cord into her bra. The victim did not hear this conversation, as she was inside the store.

When they got back into the Cadillac, they drove around some more and finally stopped on a local road where Defendant pulled Pontiff out of the car and hit her, then grabbed the victim. Defendant urged Pontiff to choke McIntosh, who had fallen to the ground. Pontiff was kneeling over her, but did not choke her, so Defendant put the cord around the victim's neck to choke her. McIntosh tried to defend herself by putting two fingers between the cord and her neck. She begged Pontiff to help her. Defendant was unsuccessful in choking the victim; at that point, he punched Pontiff and put her hands on the victim's throat. He then put his hands over Pontiff's hands and began squeezing. The victim's legs were still moving, and Defendant stomped on her until she died.

Subsequently, Defendant and Pontiff drove to meet a man who handed Defendant a Delta Fuel card; Defendant drove the victim's Toyota, and Pontiff Defendant's Cadillac. Pontiff and Defendant proceeded to Delta Fuel to put gas into the Toyota and into a gas can. Defendant used the gas in the can to burn McIntosh's body in a barrel. The pair rented a hotel room at about 3 AM and woke up about 6 AM to return to the barrel. Defendant decapitated the victim's corpse with a shovel; he discarded her ribcage in some nearby woods and disposed of her skull in another wooded area. As they left the area, they neared a bridge, and Defendant threw the shovel out of the car window.

The following Friday, Pontiff drove the victim's car to Terrebonne Parish with some bags of clothing related to the murder. Defendant instructed her to burn the clothes and the car. The victim's mother filed a missing person's report, and the subsequent investigation led police to Pontiff in Terrebonne Parish. Authorities found McIntosh's abandoned vehicle there and soon linked it to the missing person's case from Ouachita Parish. Additionally, Pontiff told her boyfriend, Lee Short, III, who lived in Terrebonne Parish, about the murder, and he told Pontiff's mother. Pontiff's mother then contacted law enforcement. Along with other items, the shovel and fragments of the victim's bones were recovered during the investigation, which led to the arrest of Pontiff, who subsequently pled guilty to manslaughter, and the arrest and trial of Defendant.

## DISCUSSION

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent present.

I.    *Assignment of Error Number One*

Defendant argues the evidence adduced against him at trial was insufficient to support his conviction for second degree murder. As the State suggests, Defendant's core assertion is that Pontiff was not a credible witness.

The test for an insufficient-evidence claim is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact

4

finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Second degree murder is defined by La.R.S. 14:30.1, which states, in pertinent part:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm[.]

The current record is extensive, as the trial transcript itself spans twelve volumes. Having reviewed said transcript, Defendant is correct in asserting that the case against him hinged upon Pontiff's testimony. Her testimony supports the required elements of the crime, i.e., that Defendant killed McIntosh with the specific intent to do so.

Pontiff's credibility was certainly open to attack. Defendant notes a number of instances in which she changed her story regarding details of the crime. At trial, Pontiff acknowledged lying to police through the course of five interviews. She explained that, at the time, she was still in love with Defendant, and she was also scared due to her involvement in the crime. One of the detectives testified that Pontiff "lied all throughout the investigation." Another detective testified similarly. Pontiff acknowledged her lies on direct, explaining that she wanted to conceal the extent of her involvement in the murder; she also acknowledged that she had lied in the past in connection with her life as a drug-user. In its closing argument, the State remarked, "They did this together. Mr. Regan [defense

5

counsel] likes to talk about lies that Leah Pontiff told. She is not the greatest person."

However, the State also pointed out that Pontiff's eyewitness testimony was corroborated by three key items of evidence: cell phone records, gas pump records, and DNA/blood evidence on one of Defendant's shoes.

Regarding the cell phone evidence, Special Agent William C. "Chuck" Williams testified regarding call detail records (CDRs) to identify cell towers used by cell phone numbers associated with Defendant and Leah Pontiff on the dates pertinent to the murder, i.e., June 15-16, 2014. The FBI agent's analysis showed that both Defendant's and Pontiff's AT&T signals used cell towers in the Sicily Island area between 10:03 PM and 10:42 PM, between 11:29 PM and 11:48 PM, between midnight and 1:59 AM, and between 2 AM and 3:30 AM. Analysis also showed such activity at 3:32 AM, at 4:25 AM, and at 4:27 AM in the vicinity of Chase, Louisiana, the location of a motel where Pontiff and Defendant allegedly stayed. There was further cell activity near Sicily Island at 5:20 AM, then in a nearby community between 6:23 AM and 6:44 AM, then in communities north of Sicily Island along Highway 425 at 7:00 AM and 7:09 AM. This evidence suggests that Defendant was in the vicinity of Sicily Island in the late-night-to-early-morning hours of June 15-16, 2014, i.e., the general time period and area of the murder, as recounted by Pontiff.

As for the gas pump related evidence, electronic records of a company called Delta Fuel Company showed that one of its pumping stations was used after midnight on June 16, 2014, to pump eleven gallons of gas, then used again about a half hour later to pump approximately twelve gallons. The card was assigned to a driver for an area hospital, Evora Humphries; those times were not normal times

6

for a clinic driver to get gas, according to Janice Strong, accounts payable clerk for Catahoula Parish Hospital District #2 Medical Center. Peggy Olivero, who managed billing for Delta Fuel Company, largely echoed Strong's testimony. At the time of the murder in 2014, Delta Fuel had an unmanned pumping station in Sicily Island; the company issued gas cards to customers, and the cardholders could use the cards to obtain gas at the station twenty-four hours a day. According to Olivero, someone pumped gas at the Sicily Island station at 12:57 AM and again at 1:30 AM; the approximate amounts were the same as stated by Strong.[2] The account for the card was designated to Catahoula Parish Hospital District. Area resident Maurice Humphries testified that Evora Humphries is his mother; she lost her job as a driver for the medical center due to his act of stealing her company gas card. On the night of June 15, 2014, which happened to be Father's Day, he took the card from his mother's purse while she was sleeping and turned it over to Defendant. Humphries later contacted Defendant, as Humphries needed the card back before his mother got up at 5:30 AM. Defendant texted back that the card was outside on Mrs. Humphries' car; when Humphries looked, the card had been left stuck in the vehicle's window seal. Humphries estimated the card was returned between 3 AM and 4 AM. Pontiff testified that after the murder, she and Defendant drove to the Delta Fuel station, where he put gasoline into a container. They drove to a nearby cornfield, where Defendant put the victim's corpse into a barrel, poured gasoline on it, and then lit it on fire. Phone records show a series of calls between Defendant and Humphries in a time period between 1:18 AM and 1:49 AM.

---

[2]Olivero testified that these were the correct times; the times on the paperwork were not correct, as the company clock was fast.

Regarding the blood evidence, blood was found on a size twelve Rocawear-brand shoe that was among the bagged items that Pontiff had taken to Terrebonne Parish. DNA testing determined that it was the victim's blood. Pontiff claimed this shoe belonged to Defendant, but testing did not identify his DNA in the shoe. In a statement to police early in the investigation, Defendant told investigators that he wore a size twelve, and police found another pair of Rocawear shoes in a storage unit Defendant was using. At trial, he was shown to be wearing size thirteen shoes.

While Pontiff, the sole eyewitness, has questionable credibility, the cell phone-related evidence corroborates her version of events. This evidence, the gas card evidence, and Maurice Humphries' testimony put Defendant in the vicinity of the murder during the time period the murder and disposal of the body took place. The shoe evidence was congruent with Pontiff's testimony that Defendant ultimately stomped McIntosh to death; however, the bloody shoe's link to Defendant was based upon Pontiff's version of events and, thus, does not present as strong a corroboration of her testimony as other evidence.

Defendant took the stand in his own defense, and his credibility is also questionable. On appeal, he states he "had a compelling argument that it was his SIM card authorities were tracing, but that his SIM card was in Gwen McIntosh's phone." This is not what he told police in his initial statement. At first, he denied leaving the Monroe area on the relevant dates; when confronted with fact that phone-related evidence placed him in Sicily Island during the relevant time period, he talked about participating in family activities but mentioned nothing about the victim having his SIM card. Defendant failed to mention this in his second statement as well. Regarding the phone evidence, Defendant argues that the cell

phone location evidence indicated he made a call from Clayton, Louisiana, at about 3:32 AM. The State's closing argument suggested the call was made to Defendant by Pontiff as they passed through or near Clayton. The map scale on the FBI agent's cell phone maps indicates that Clayton is ten to fifteen miles from Sicily Island. We find that a single call, apparently four-seconds long, within fifteen miles of the relevant area is not fatal to the State's case. The remainder of the cell phone related and gas card related evidence, along with the testimonies of Pontiff and Humphries, puts Defendant in the relevant area during the relevant time period.

At the time of the trial, Pontiff had not been sentenced. In its closing argument, the State admitted to using a carrot-and-stick approach with witnesses subject to criminal sentences. Thus, the jury was fully aware of this, and it was a factor to be weighed in the factfinding process. Also, Defendant notes that the apartment manager who evicted Defendant and the victim from their unit in Sterlington testified that she saw the victim alive after the eviction notice was posted on June 16, 2014. Again, this was another item of evidence to be assessed by the jury. As stated in *Kennerson* and acknowledged by Defendant in brief, witness credibility is a matter for the jury and not one to be re-assessed by the appellate courts. 695 So.2d 1367.

Defendant suggests that Pontiff was in love with him and wanted the victim out of the way. Pontiff admitted to being in love with Defendant and had already pled guilty to manslaughter. Regardless, if Pontiff wanted McIntosh dead, that would not exonerate Defendant.

9

For the foregoing reasons and pursuant to *Kennerson*, we find that the jury's decision to convict Defendant was not irrational. Thus, Defendant's first assignment of error lacks merit.

*I.*     *Assignment of Error Number Two*

In his second assignment of error, Defendant argues that the trial court erred by denying his motion to suppress, thus allowing improper "other crimes evidence" to be admitted at trial. As Defendant observes, the trial court conducted a hearing on the motion to suppress on September 22, 2017. However, a review of the record indicates that the "other crimes evidence" the State wanted to use was discussed in a hearing held on August 2, 2018. The issue arose because the State filed a Notice of Intent to Use Other Crimes.

The use of "other crimes evidence" is governed by La.Code Evid. art. 404(B):

> **B. Other crimes, wrongs, or acts.** (1) . . . , evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

At the hearing, the State acknowledged that the acts at issue, prostitution and use of illegal drugs, were not directly relevant to the murder. However, it argued that those activities were "interwoven in the context of what happened."

Thus, the State's approach was not analogous to evidence traditionally known as "res gestae," because the acts at issue were not necessarily proximate in time to the murder or integral to it. Rather, the evidence at issue, i.e., the general

10

drug use and prostitution, was more similar to that discussed in *State v. Colomb,* 98-2813, pp. 3-4 (La. 10/1/99), 747 So.2d 1074, 1076:

> The *res geaste* [sic] or integral act doctrine thus "reflects the fact that making a case with testimony and tangible things not only satisfies the formal definition of an offense, but tells a colorful story with descriptive richness." *Old Chief v. United States*, 519 U.S. 172, 186, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997). The test of integral act evidence is therefore not simply whether the state might somehow structure its case to avoid any mention of the uncharged act or conduct but whether doing so would deprive its case of narrative momentum and cohesiveness, "with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict."

Defendant's brief makes a rather general argument with few record references to specific testimony. Regarding the potential prejudice to his case, the State accused Defendant of being a pimp in it close. However, this was obviously a function of argument rather than evidence, and Defendant has not assigned error to any part of the argument. Also, when he took the stand, Defendant admitted to a ten-year-old drug conviction. Although he denied that he currently sold drugs, he admitted "I have been around it." In his June 2014 interview with police, Defendant admitted to having been "locked up" in both Texas and Louisiana. On a related note, the State argues there was no prejudice because Defendant took the stand and was thus subject to cross-examination. The State cites no jurisprudence but makes the practical argument that Defendant could be questioned about past offenses (as he was) and that denials of such offenses by Defendant would have allowed the State to introduce evidence of said offenses. However, usually evidence of arrests for offenses for which there has been no conviction is not admissible upon the issue of credibility. La.Code Evid. art. 609.1(B); *State v. Johnson*, 94-1379, pp. 9-10 (La. 11/27/95), 664 So.2d 94, 99.

Ultimately, the evidence at issue was admissible under the rationale cited in *Colomb*, 747 So.3d 1074. Pontiff's testimony indicated that she, the victim, and some of their associates were frequent drug users. Also, the prejudice of having the jury hear allegations of drug related acts was lessened by Defendant's own admissions in that regard. The record indicates that he, Pontiff, and McIntosh were involved in drugs to some extent. Thus, any evidence introduced on this point did not necessarily depict Defendant as a "bad man," but simply depicted the lifestyle that he and some of the other witnesses were living around the time of the murder.

Although the record includes multiple references to, or questions about, Defendant's possibly being a pimp, or suggestions that he might have been the victim's pimp, such references would arguably amount to improper comments, questions, or arguments. They do not constitute "other crimes evidence," as there does not appear to be any actual evidence that Defendant was a pimp for anybody. As mentioned earlier, Defendant does not allege improper argument on appeal. The State also referred to Defendant as a "drug dealer" in its close, but again, that was a matter of argument, not evidence.

For the reasons discussed, this assignment of error lacks merit.

II.    *Assignment of Error Number Three*

In his third assignment of error, Defendant argues that he was improperly interrogated after requesting counsel, in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), during an interview on June 28, 2014. The State counters, in its brief, that Defendant was not in custody for the murder but was instead on a probation hold from another parish. After listening to the relevant portion of the audio, we find there is no audible request for an attorney during the early part of the statement; later, when Defendant clearly invoked his rights, the

12

interview ceased. Defendant points to a section of transcript that suggests a detective may have known of the earlier invocation, but again, having listened to the audio, none can be heard. At the hearing on the matter, held on September 7, 2017, the parties focused on a section of the interview that was preserved at approximately 4:19 (four hours, nineteen minutes) of the recording. The section of transcript highlighted by Defendant is from the same portion of the interview. Neither the transcript nor the recording includes a request for counsel. This appears to have been the basis for the trial court's ruling at the September 2017 hearing, rather than any issue regarding custody. We find the trial court's ruling was correct, and this assignment lacks merit.

### III. Assignment of Error Number Four

In his fourth and final assignment of error filed by his counsel, Defendant argues that his trial counsel should have been allowed to move closer to witnesses because counsel had difficulty hearing various witnesses. Defendant now claims that "the lower court made no attempt to accommodate Defense counsel." The State's counterargument is that Defendant was simply using the alleged hearing problem as a trial tactic. For example, when one of the prosecutors was conducting an examination of a State witness, Defendant's counsel placed a chair close behind the prosecutor. Unfortunately, neither party provides record page references. However, this specific matter came up after the testimony of apartment manager Irene Watson. The court and the parties discussed the matter outside the presence of the jury. The State argued strenuously that counsel's action of moving the chair was improper, and the trial court agreed. Defense counsel offered the explanation that he was having trouble hearing the witness but generally acquiesced in the ruling.

As Defendant observes on appeal, defense counsel complained at trial that he was having trouble hearing Leah Pontiff's testimony. The State argued that counsel was simply trying to interrupt the witness and that counsel would be able to cross-examine her. Defense counsel retorted that he would not be able to cross-examine a witness that he had not been able to hear during direct examination. The trial court sustained the State's objection and denied Defendant's oral motion for mistrial. The State asked Pontiff to speak louder. We note that defense counsel was able to hear Pontiff well enough to raise objections that the State was leading her.

There were a number of instances throughout the lengthy trial in which Defendant's counsel complained he could not hear various witnesses. However, the State and the trial court generally asked its witnesses to repeat their answers or to speak more loudly. After reading the entirety of the trial record, counsel's cross-examination does not appear to have been impaired, and Defendant does not now point to any specific instance in which counsel's ability to cross-examine witnesses was impaired.

The trial judge in the present case wore a hearing aid, and there is no indication he was unable to hear the witnesses or otherwise function properly in his role. If defense counsel was attempting to represent Defendant on this murder charge while being genuinely hearing-impaired, then the matter may need to be revisited in the post-conviction process.

However, as presented here, this assignment of error lacks merit.

IV.    *Pro Se Assignment of Error*

In his pro se brief, Defendant complains that the lead prosecutor hugged State witness Lee Short, III after Short's testimony. Defendant argues that this was

a form of vouching for Short's testimony. Defendant correctly argues that prosecutors cannot vouch for the credibility of witnesses or use the prestige of the district attorney's office to provide support to the State's case. *State v. Kaufman*, 304 So.2d 300 (La.1974).

The Defendant notes the colloquy at issue:[3]

**THE COURT:**

Is the door closed?

**MR. BURGET:**

Not all the way, your Honor.

**THE COURT:**

Yes? Okay.

**MR. BURGET:**

Yes, sir.

**THE COURT:**

Mr. Regan, it's with you.

**MR. REGAN:**

Yes, sir. I note an objection to the following. The witness comes off the witness stand directly in front of the jury. The prosecutor then gives the guy a bear hug and slaps him on the back. I think that's an improper comment, at this point, that should never have been made by this prosecutor. You can't congratulate people when they come off the stand with a hug and a slap on the back. I think it's totally improper. It says a message, at this point, of endorsement by the DA that's not permitted, at this point. It's a comment by the district attorney -- it's a comment by the DA. It's loud as if it was verbal, at this point, and I think that was inappropriate.

**MR. BURGET:**

_____

[3]Defendant appears to be correct that there was no admonishment regarding this objection. Defendant appears to be incorrect that the events were preserved on video. The district court clerk advised via telephone that the courtroom has security cameras. However, it does not appear that security footage was entered in the trial record.

Your Honor, I shook --

**THE COURT:**

Mr. Burget?

**MR. BURGET:**

-- the man's hand, and I grabbed his shoulder and told him to be safe on the way back home.

**THE COURT:**

Yeah.

**MR. REGAN:**

That's --

**MR. BURGET:**

I greet everybody when they take the stand --

**MR. REGAN:**

Not like that.

**MR. BURGET:**

I greet everybody when they take the stand with a handshake.

**THE COURT:**

And it's a customary usage and --

**MR. BURGET:**

I certainly do, your Honor.

**THE COURT:**

-- a custom that you do with -- in all witnesses, Mr. Burget?

**MR. BURGET:**

Yes, sir.

**MR. REGAN:**

16

What's with the --

**MR. BURGET:**

And I slapped him on the shoulder.

**MR. REGAN:**

-- slap on the back?

**THE COURT:**

All right. So noted for the record. Anything --

**MR. BURGET:**

I may not do that to a female --

**THE COURT:**

-- else, Mr. --

**MR. BURGET:**

-- but usually the guys I do, if I know them well.

**THE COURT:**

Right. An appropriate handshake in response to each [] witness, right, Mr. Burget?

**MR. BURGET:**

I'm just being friendly and telling the guy thank you for coming, your Honor, and told him safe travels.

**THE COURT:**

Okay.

**MR. REGAN:**

Sir, I have no doubt he's shaking hands with witnesses as they come off. I've shaken a hand, too. But this is not that, and for the record, I will demonstrate. He slapped him on the back, at this point, and shook his hand and that is a lot more than just shaking somebody's hand and thanking them for coming.

**THE COURT:**

I understand.

**MR. BURGET:**

Your Honor, I shook his hand --

**MR. REGAN:**

It's an embrace --

**MR. BURGET:**

-- with my other hand and slapped his --

**MR. REGAN:**

-- it's an embrace --

**MR. BURGET:**

-- right shoulder with my left hand.

**THE COURT:**

All right. So noted for the record.  Anything else, gentlemen?

**MR. REGAN:**

Note my objection.

**THE COURT:**

So noted.

**MR. BURGET:**

I apologize for being friendly.

**THE COURT:**

All right.

**MR. REGAN:**

I do note, and I'm not sure how to correct the problem.  I think it's an error, it's an error and for the record, I'll --

**THE COURT:**

It's --

**MR. REGAN:**

-- move for a mistrial.

**THE COURT:**

At this point?

**MR. REGAN:**

At this point, I move --

**THE COURT:**

Denied.

**MR. REGAN:**

-- for a mistrial.  For that?  Yes, sir.

**THE COURT:**

Denied.

**MR. REGAN:**

Note my objection.

**THE COURT:**

So noted.

**MR. REGAN:**

Thank you.

**THE COURT:**

Court's at recess.

**MR. BURGET:**

Thank you, your Honor.

Thus, Defendant presents an allegation that a prosecutor in this case, through his physical gestures or actions, vouched for the credibility of State witness Lee Short, III. As mentioned earlier, Short was a resident of Terrebonne Parish and a former boyfriend of Leah Pontiff. After the murder, Pontiff drove the victim's car, with bags of sooty clothes and the blood-stained shoe mentioned earlier, to the Terrebonne area where she had grown up. According to Short, Pontiff put the bags under the trailer where he and his father lived. He and Pontiff had sex and used illegal drugs together, but Short testified that he became concerned because Pontiff appeared to be involved with stronger drugs than he normally used. Further, Pontiff told Short that she had been involved in a murder. Short reported this alarming revelation to Pontiff's mother, who in turn contacted law enforcement.

We found no cases regarding the possibility of physical actions or gestures being used to vouch for a witness's credibility. The closest case extant is *State v. Jackson*, 629 So.2d 1374, 1383 (La.App. 2 Cir. 1993), *writ denied*, 637 So.2d 1046 (La.1994):

> It is well settled that communications between jurors and witnesses in a criminal trial, absent a showing that the actions prejudiced the defendant, furnish no grounds for upsetting a conviction. *State v. Day*, 414 So.2d 349 (La.1982); *State v. Mims*, 524 So.2d 526 (La.App. 2d Cir.), *writ denied*, 531 So.2d 267 (La.1988); *State v. Green*, [437 So.2d 302 (La.App. 2d Cir.), *writ denied*, 443 So.2d 1121 (La.1983)] *supra*. In the present case, Jackson failed to demonstrate any prejudice whatsoever.
>
> At the conclusion of the first day of trial, Walsworth left the courtroom after testifying and, in a hallway, soon engaged two officers in conversation. Within minutes the court also released the jurors, some of whom proceeded down the same corridor. As the released witness simultaneously departed, he opened the door for an unidentified woman in the manner, as explained in a subsequent hearing, he had been "brought up to do." He also shook hands with one jury member, Kenneth Guyotte, after that individual extended his hand in greeting. Only a very limited exchange of pleasantries occurred, and without any discussion of the case. Thus, it is obvious

20

that the trial court acted correctly in denying the mistrial. *Cf. State v. Guidry*, 496 So.2d 650 (La.App. 1st Cir.1986), *writ denied*, 500 So.2d 420 (La.1987).

Nor should the witness's testimony have been stricken based upon defense contentions that he violated the rule of sequestration. Clearly, his casual, innocuous courtesies did not impinge upon that order. Furthermore, Walsworth had already been released from the restriction. Simply put, defendant's motion borders on absurdity.

It is also urged that Guyotte should have been replaced by the alternate. However, as noted above, defendant revealed no prejudice from the exchanged pleasantries.

Although *Jackson* did not address the same specific situation at issue in the present case, it does provide an indicator that common pleasantries of everyday life should not be recognized as having undue influence upon jurors. Further, Short's testimony related more to the early stages of the investigation, before police arrested Pontiff, collected the bags she had brought, and brought her and the bags to Catahoula Parish. Short had some secondhand information regarding the murder, via what Pontiff had told him, but he was not present at the murder, did not know Defendant, and did not know anything about Catahoula Parish. Thus, any boost to his credibility was unlikely to have influenced jurors in the State's favor.

For the reasons discussed, this assignment of error lacks merit.

## DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

21